INGWERSEN BROS., APPELLEES, v. F. O. EDGECOMBE, RECEIVER OF THE FARMERS & DROVERS BANK OF BATTLE CREEK, APPELLANT, ET AL.

FILED NOVEMBER 20, 1894. No. 5774.

Corporations: INSOLVENCY: DIRECTORS AND OFFICERS: ABUSE OF TRUST: DISTRIBUTION OF ASSETS. The relation of the directors and managing officers of an insolvent private corporation toward the property and assets thereof is that of trustees for all of the creditors. Such officers cannot take advantage of their position to secure a preference for themselves, but are required to share ratably with other creditors.

APPEAL from the district court of Madison county. Heard below before ALLEN, J.

The facts are stated in the opinion.

*Robinson & Reed*, for appellant:

The directors and officers of the corporation are trustees of the creditors and must manage the property and assets with strict regard to their interests; and if the directors and officers are also creditors, while the insolvent corporation is under their management, they cannot secure for

themselves any preference or advantage over other cred-
itors. (*Haywood v. Lincoln Lumber Co.*, 26 N. W. Rep.
[Wis.], 187; *Marr v. West Tennessee Bank*, 4 Cold. [Tenn.],
471; *Koehler v. Black River Iron Co.*, 2 Black [U. S.],
715; *Curran v. Arkansas*, 15 How. [U. S.], 306; *Rich-
ards v. New Hampshire Ins. Co.*, 43 N. H., 263; *Bradley
v. Farwell*, 1 Holmes [U. S. C. C.], 433, *Drury v. Cross*,
7 Wall. [U. S.], 299; *Paine v. Lake Erie & L. R. Co.*, 31
Ind., 353; *Gas Light Co. v. Terrell*, L. R., 10 Eq. [Eng.],
168; *Hoyle v. Plattsburgh & M. R. Co.*, 54 N. Y., 315.)

*Powers & Hays*, contra.

Post, J.

On the 22d day of June, 1891, the Farmers & Drovers
Bank of Battle Creek issued to John F. Teidgen a certifi-
cate of deposit in the usual form for $5,000, payable Sep-
tember 1, 1891, and bearing interest at eight per cent per
annum.   On the 9th day of July following said Teidgen,
as vice president of said bank, for the purpose of securing
the said certificate of deposit executed a mortgage whereby,
in behalf of the bank, he conveyed to himself a lot in the
village of Battle Creek, owned and occupied by said bank
as a place of business, and in which B. Meyel, the cashier,
also joined.   On the 15th day of the same month the said
bank was by this court adjudged to be insolvent and the
defendant Edgecombe named as receiver to wind up its
business under the direction of the court.   On the 11th
day of March, 1892, this proceeding was commenced by the
plaintiffs, assignees of Teidgen, in the district court of
Madison county, to foreclose the mortgage above mentioned.
A decree having been allowed by the district court in ac-
cordance with the prayer of the petition, the cause was re-
moved into this court upon the appeal of the receiver.

The numerous propositions discussed by counsel in the
briefs submitted are included in the one inquiry, viz., is

the mortgage to Teidgen valid as against the receiver of the bank? It should in this connection be noted that the plaintiffs are not shown to be *bona fide* holders of the certificate of deposit, and do not in fact claim any equities superior to those of their assignor. In addition to the facts above stated it is disclosed by the record that the bank had been insolvent for some considerable time immediately preceding the date shown by the certificate of deposit, and was at no time thereafter able to pay its creditors in full. The capital stock of the bank was, during that time, held by R. H. Maxwell, who was president; John F. Teidgen, vice president; Ben. Meyel, cashier, and A. H. Hensel; said stockholders all being members of the board of directors thereof. The transactions which resulted in the execution of the mortgage are best understood from the testimony of the parties thereto. For instance, Teidgen, on his direct examination, testified for the plaintiffs as follows:

Q. State in full and in detail the circumstances under which you deposited the sum of $5,000 with said bank, and whether said bank ever gave you security for the payment of the same; and if so, the character of said security, and whether the amount due on said certificate has ever been paid.

A. At the time I deposited that money, Ben. Meyel, the cashier, came to me at my house while the president was not at home. The president was in Lincoln, Nebraska, and wanted me to advance the bank $5,000. I did not have the money, but drew a sight draft on Ingwersen Bros., and they paid it. The draft was for that sum. Ben. Meyel, the cashier, told me that the bank wanted $5,000 for a couple of months. * * * During that time they agreed to give me a mortgage on the building for $5,000 and have done it. It then run on and Ingwersen Bros. wanted their money, and I assigned the mortgage and certificate of deposit to them and told them to foreclose whenever they pleased. The cashier wrote the mortgage

and I signed it as vice president because the president was not there, he being in Lincoln, Nebraska. I don't know whether the cashier signed the mortgage or not. The mortgage covered the bank building. No part of the certificate of deposit has ever been paid to me. * * *

Q. State whether or not the cashier, or other officers of the bank, said anything about giving you a mortgage to cover said certificate of deposit at the time you deposited the $5,000 in the bank; and if so, what was said in regard to it and who said it?

A. The cashier did, if anything should go wrong.

Q. Did the cashier or other stockholder of the bank afterward say anything to you about giving a mortgage, and if so what?

A. I don't remember what they said, only I got the mortgage.

Meyel, the cashier, testified for the plaintiffs as follows:

Q. What was said by you to Teidgen in regard to giving security for this loan?

A. Why I told him at the time we would secure him with the bank building in case the bank should get tight or embarrassed so that they was going to close it up.

Q. Now, then, on this day when he advanced this loan, he was not to have security unless the bank should afterwards become embarrassed?

A. No; if the bank was in good sound condition we wouldn't give him the security and would not want to have it recorded.

Q. Your talk with John Teidgen was to depend upon whether, afterwards, there was danger of the bank going into the hands of a receiver?

A. The bank was in condition then to go into the receiver's hands. When I borrowed the money the understanding was he was to get security.

Q. But isn't it a fact if everything went right he was not to have security?

A. Yes.

The facts clearly established by the foregoing evidence are that the money represented by the certificate of deposit was voluntarily advanced by Teidgen for the purpose of relieving the immediate necessity of the bank without any definite agreement for security, and that the purpose of the mortgage was to give preference to his claim as a general creditor thereof. The question, therefore, of the authority of the bank to raise money by mortgage upon its real estate to meet its current obligations is not here presented. The vital question in this record is the character of the relation which the directors and managing officers of an insolvent corporation bears toward its creditors. That such officers are not trustees in the technical sense of the term is apparent, and yet it is well settled, both by authority and on principle, that they are within the rule which guards and regulates dealings between trustee and *cestui que trust*. But the application of that rule has resulted in a diversity of opinion. It is maintained by some courts that unless prevented by charter or the operation of statute in the nature of bankrupt laws, insolvent corporations possess the same power to make preference among their creditors as natural persons. But the view which may be said to rest upon the soundest reasons and is sanctioned by the decided weight of authority is that when a corporation becomes insolvent, its property and assets constitute a trust fund for the benefit of its creditors, and that the directors and officers in possession thereof, being trustees for all the creditors, cannot take advantage of their position to secure a preference for themselves, but must share ratably with the other creditors. (See *Haywood v. Lincoln Lumber Co.,* 64 Wis., 639; *Hopkins' Appeal,* 90 Pa. St., 69; *Sicardi v. Keystone Oil Co.,* 149 Pa. St., 139; *Olney v. Conamicut Land Co.,* 16 R. I., 597; *Rouse v. Merchants Nat. Bank,* 46 O. St., 493; *Hays v. Citizens Bank,* 51 Kan., 535; *Thompson v. Huron Lumber Co.,* 4 Wash. St., 600; *Corey v. Wadsworth,* 11 So. Rep. [Ala.], 350; *Adams v. Kehlor*

*Milling Co.*, 35 Fed. Rep., 433; 2 Morawetz, Corporations, 787, 803; Beach, Private Corporations, 241 *et seq.*) In Wait, Insolvent Corporations, section 162, it is declared: "The practical working of the rule sustaining corporate preferences is monstrous. The unpreferred creditors have only a myth, or shadow left to which resort can be had for payment of their claims, a soulless, fictitious, unsubstantial entity that can be neither seen nor found. The capital, and assets of the corporation, the creditors' trust fund, may, under this rule, be carved out and apportioned among a chosen few, usually the family connections or immediate friends of the officers making the preference. This rule of law is entitled to take precedence among the many reckless absurdities to be met with in cases affecting corporations as being a manifest travesty upon natural justice." Nor is the fact that the advancement was in this instance for the accommodation of the bank material, since, as we have seen, the rights of Teidgen were those of a general creditor only. Transactions of the character here involved are voidable by the corporation, its stockholders or creditors (1 Beach, Private Corporations, 242); and the right of the bank to interpose the illegality of the mortgage as a defense passed to the receiver under the order of this court. It follows that the decree of the district court must be reversed and the cause remanded for further proceedings therein.

REVERSED AND REMANDED.